**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-1493**

_____

JAMES A. BOLEY, JR., Administrator of the Estate of Robert Lee Boley, deceased,

Plaintiff – Appellee,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.; ARLEATHIA PECK, LPN,

Defendants – Appellants,

and

NURSESPRING, LLC; ALVIN HARRIS, M.D.; CHARLETTE HAYES; SERGEANT EMMANUEL BYNUM; OFFICER JOEL GUY,

Defendants.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Roderick Charles Young, District Judge. (2:21-cv-00197-RCY-LRL)

_____

Argued:  September 26, 2024                 Decided:  December 30, 2024

_____

Before GREGORY and QUATTLEBAUM, Circuit Judges, and Terrence W. BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.

_____

Affirmed by unpublished opinion. Judge Boyle wrote the opinion, in which Judge Gregory joined. Judge Quattlebaum wrote a separate opinion concurring in part and in the judgment.

––––––––––––––––––

**ARGUED:** Nathan Henry Schnetzler, FRITH, ANDERSON & PEAKE, PC, Roanoke for Appellants. Daniel Zemel, THE KRUDYS LAW FIRM, Richmond, Virginia, for Appellee. **ON BRIEF:** Matthew E. Kelley, Kari K. Munro, FRITH ANDERSON + PEAKE, P.C., Roanoke, Virginia, for Appellants. Mark J. Krudys, THE KRUDYS LAW FIRM, Richmond, Virginia, for Appellee.

––––––––––––––––––

Unpublished opinions are not binding precedent in this circuit.

BOYLE, District Judge:

Armor Correctional Health Services, Inc., a company that provides healthcare services to incarcerated populations, appeals from a multi-million dollar judgment against employee and licensed practical nurse ("LPN") Arleathia Peck in favor of James A. Boley, Jr., administrator of the estate of Robert Lee Boley, who died of a ruptured aortic aneurysm while incarcerated at the Deerfield Men's Work Center in Capron, Virginia. The principal issue presented is whether the District Court erred in denying Armor's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). Secondarily, we must consider whether the District Court erred in denying Armor's motion for a new trial. Concluding that the District Court did not err in either determination, the judgment is affirmed.

## I.

Shortly after 9:00 AM on April 16, 2019, Robert Boley began experiencing debilitating chest pain. J.A. 287. Around 2:15 PM, at the urging of his friends, he knocked on the nurse's office door. J.A. 554, 875–76. The nurse on duty, LPN Arleathia Peck, declined to examine Boley, instead telling him to submit a sick call request. J.A. 554, 876. LPN Peck, who usually left Deerfield every day at 2:30 PM, denied at trial that this interaction ever happened. J.A. 594, 1130.

Boley continued to experience chest pain and was struggling to breathe, so he laid on the floor to attract attention, which prompted correctional officers to call for medical

assistance since LPN Peck had left. J.A. 135, 555, 882. LPN Charlette Hayes arrived to find Boley on the floor and noted that he had been denied medical care earlier that day. J.A. 626, 754–55. She took Boley's vitals and found a blood pressure of 66/48—far below his normal range of 110-115/70-78—and a pulse of 60 beats per minute. J.A. 667, 639–42. At 3:04 PM, LPN Hayes contacted Dr. Alvin Harris, the on-call physician supervisor, and reported Boley's vitals and complaints of chest pain. J.A. 617. Dr. Harris instructed LPN Hayes to take another reading of his vitals as well as an EKG. J.A. 631, 704. LPN Hayes did so, despite being inexperienced with EKGs, and called Dr. Harris at 3:43 PM to report that Boley's vitals had improved but his EKG was "borderline abnormal." J.A. 666, 670. Dr. Harris asked LPN Hayes to give Boley an antacid and follow up with him again in two hours. J.A. 710. LPN Hayes updated Dr. Harris again at 6:52 PM, reporting that Boley "was still having some discomfort, but it was significantly improved." J.A. 668. Dr. Harris scheduled an appointment for Boley to be seen in the morning. J.A. 675.

Throughout the evening, Boley called friends and family; he told his brother James that LPN Peck "gave me the brush-off game" and that his chest pain was "serious." J.A. 479–80. Correctional officers received numerous concerned phone calls from Boley's brothers, but they did not seek emergency assistance. J.A. 1198.

Guards performed rounds at 8:30 PM and 11:45 PM on April 16, and 3:00 AM on April 17, at which time they reported that Boley was laying down and breathing. J.A. 368, 948, 1205. During their 5:30 AM rounds, the guards found Boley sitting up in his cell and unresponsive. J.A. 368–69, 949. He was pronounced dead at 6:10 AM, caused by a ruptured aortic aneurysm. J.A. 135.

4

In April 2021, James Boley, Jr., the administrator of the estate of Robert Boley, brought state law claims of negligence, gross negligence, and willful and wanton negligence,[1] and a 42 U.S.C. § 1983 claim of deliberate indifference against Armor employees LPN Peck and Dr. Harris, and Armor itself under a theory of *respondeat superior* (together, the "Armor Defendants").[2] A five-day trial began on December 5, 2022. At trial, the Armor Defendants were all represented by the same counsel.

On the second day of trial, Plaintiff called Carlo Wilson, who was also incarcerated at the Deerfield Men's Work Center. Wilson was asked about LPN Peck's reaction to other inmates' medical requests, including "turn[ing] down" some requests, and counsel for the Armor Defendants objected. J.A. 571–72. The District Court and the parties engaged in a discussion regarding LPN Peck's habit in failing to provide treatment to some individuals; much of this discussion took place in front of the jury prior to the Court holding a bench conference, and ultimately the Court sustained the objections. J.A. 571–75, 578.

Plaintiff continued his case-in-chief on the third day of trial. That morning, the District Court provided time limitations for the remainder of trial, to which no party objected. J.A. 699–700.

Plaintiff then called Marese Francis, another inmate. Over various objections, Francis opined that LPN Peck "didn't really act like she cared about nothing" and that his

---

[1] He withdrew his claim for willful and wanton negligence prior to trial. J.A. 159, 1528.

[2] Boley Jr. also sued LPN Hayes and Hayes's employer NurseSpring LLC, and two prison guards. J.A. 29–32. LPN Hayes and NurseSpring LLC settled prior to trial. J.A. 1462. The case against Armor, Peck, Harris, and the two prison guards proceeded to trial.

understanding of her reputation was that "[s]he just didn't care." J.A. 878–80. Counsel for the Armor Defendants moved to strike the reputation testimony about LPN Peck. J.A. 894. The Court struck the testimony as propensity evidence and read a curative instruction to the jury indicating that they should disregard any reputation evidence. J.A. 901–902.

Plaintiff also presented three expert witnesses during his case-in-chief: Dr. Lori Roscoe, Dr. William Bethea, and Dr. Rishi Kundi.

Dr. Roscoe was admitted as an expert to testify to a nurse's standard of care as it related to LPN Peck's actions. J.A. 740. She testified that LPN Peck "significantly deviated from the standard of care" by instructing Boley to "put a complaint of chest pain as a sick call slip in the box." J.A. 743. Dr. Roscoe testified that when an inmate complains of chest pain, an LPN is required to ask questions about their chest pain and medical history, obtain the inmate's vital signs, and conduct a physical examination to determine whether it is a nonurgent issue. J.A.742, 768. She explained that "LPNs can evaluate patients, collect data about that patient, and then bring that information to a provider or to a registered nurse." J.A. 744.

Dr. Bethea was admitted as an expert to testify to both the standard of care as it relates to internal medicine with regard to Dr. Harris's breach, and to causation with regard to Boley's death. J.A. 779–80. Dr. Bethea testified that the standard of care for a patient presenting with severe chest pain and incredibly low vitals would be to transfer them immediately to a hospital. *See, e.g.*, J.A. 780–81. Specifically, he stated that "a third-year medical student should be aware of the fact that when an individual presents with the worst chest pain of their life, immediately they have your attention," and, combined with vitals

6

indicative of shock, "it doesn't take a board certified anything" to recognize the obligation to transfer the patient to the hospital. J.A. 781–82. Dr. Bethea also testified that "[t]here's a 100 percent chance that a physical examination would have shown you something that raised your level of concern for an aneurysm," J.A. 786, including potentially "one of the classic physical findings of an aneurysm[,] a pulsatile mass," J.A. 789, 792. He also testified that Dr. Harris breached the standard of care by failing to send Boley to the emergency room, *see, e.g.*, J.A. 815, and explained what would have occurred had Boley been sent to the hospital, *see, e.g.*, J.A. 794–96. Dr. Bethea repeatedly testified that Boley likely would have survived if he had been sent to the hospital any time between the onset of his symptoms at 9:00 AM on April 16 and 12:00 AM on April 17. *See* J.A. 785, 793, 796–98, 812, 833–34.

Dr. Kundi was admitted as an expert in "vascular surgery, arterial repair, stent surgery and causation, the survivability of Mr. Boley had he been brought to a hospital." J.A. 840. Dr. Kundi testified that "if he had gotten to a hospital by midnight, it was more likely than not that he would have survived." J.A. 851.

At the close of Plaintiff's evidence, the Armor Defendants moved for judgment as a matter of law on all claims pursuant to Federal Rule of Civil Procedure 50(a). J.A. 1003. Defendants moved for judgment as against Peck on the "two heightened claims"—gross negligence and deliberate indifference—J.A. 1006, and then made "a broader motion with respect to causation," stating that "we don't think the plaintiff has established causation as to anything," before challenging the sufficiency of Plaintiff's causation evidence regarding what would have happened had Boley been transferred to a hospital, J.A. 1008–09. The

7

District Court denied Defendants' motion as to all claims, finding that "the plaintiff has produced evidence on each element as it relates to Counts One, Two, and Four of the complaint on which plaintiff has the burden of proof." J.A. 1023.

At the close of the Defendants' evidence and prior to the case being submitted to the jury, the Armor Defendants made another 50(a) motion, "incorporat[ing] prior arguments that were made." J.A. 1257–58. The District Court again denied the motion, stating that "[i]t's definitely a jury question." J.A. 1260.

During closing argument, when discussing the lack of care that Boley received, Plaintiff's attorney made numerous references to his personal life to emphasize the alleged negligence. J.A. 1371. He also stated that LPN Peck's testimony was "false" and that she "lied to" the jury. J.A. 1311. No defendant objected to any of these statements.

On December 9, 2022, the jury returned a verdict finding LPN Peck liable for negligence and gross negligence, and, accordingly, Armor vicariously liable for the same. J.A. 1394–95. The jury found no liability on the part of Dr. Harris.[3] J.A. 1394–95. The jury awarded damages in the amount of $4,000,000, J.A. 1396, which was later reduced pursuant to Virginia's statutory medical malpractice cap, J.A. 1446.

The Armor Defendants then filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). J.A. 1461. Their motion focused on the argument that "Plaintiff failed to meet his burden to present sufficient evidence proving

---

[3] The jury also found that one of the correctional officers was grossly negligent, creating joint and several liability for the damages award. J.A. 1394–95. That officer later settled during the pendency of this appeal. Resp. Br. at 9 n.3.

that Nurse Peck's acts or omission were the proximate cause of Boley's death." J.A. 1462. They also moved, in the alternative, for a new trial based on improper character evidence, disparate time limits imposed on the parties, and Plaintiff's inappropriate remarks during opening and closing argument. J.A. 1462–63, 1480.

The District Court denied the Armor Defendants' motion. *See generally* J.A. 1524–55. As for Defendants' Rule 50(b) motion, the District Court found that their causation argument as to LPN Peck had not been properly raised in their 50(a) motion;[4] it also denied Defendants' motion for a new trial. The Armor Defendants appealed the District Court's ruling in its entirety.

## II.

We review *de novo* a district court's denial of a motion for judgment as a matter of law, and "view all the evidence in the light most favorable to the prevailing party" while "drawing all reasonable inferences" in their favor. *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 534 (4th Cir. 2021). We conduct our review with deference to the jury's findings, *Burgess v. Goldstein*, 997 F.3d 541, 549 (4th Cir. 2021), and "we will uphold the jury's

---

[4] Defendants argue on appeal that the District Court erred in violation of the party presentation principle when it addressed this issue *sua sponte*, as Plaintiff never made such an argument in response to Defendants' Rule 50(b) motion. *See* Opening Br. at 18–19. However, the District Court's actions were well within its discretion, as courts have inherent authority that permits them to "independently consider an issue not raised by the parties when necessary to protect important institutional interests." *United States v. Oliver*, 878 F.3d 120, 124 (4th Cir. 2017). The Supreme Court has long recognized that a "court may consider an issue 'antecedent to… and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)) (alteration in original). This is one such antecedent issue.

verdict unless 'the *only*' conclusion a reasonable jury could have reached is one in favor of the moving party," *Younger v. Crowder*, 79 F.4th 373, 381 (4th Cir. 2023) (citing *Saunders v. Branch Banking & Tr. Co.*, 526 F.3d 142, 147 (4th Cir. 2008)) (emphasis in original).

A court may grant judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find" in favor of the opposing party on a particular issue. Fed. R. Civ. P. 50(a)(1). An initial Rule 50(a) motion "may be made at any time before the case is submitted to the jury," and the movant must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). A party can renew its motion for judgment as a matter of law under Rule 50(b) after the jury has returned a verdict. Fed. R. Civ. P. 50(b). A Rule 50(b) motion can assert only the same grounds raised in the initial Rule 50(a) motion. *Price v. City of Charlotte*, 93 F.3d 1241, 1248–49 (4th Cir. 1996).

It is here that the standards of review diverge. In ruling on a properly made 50(b) motion, we review a jury's verdict to determine if "substantial evidence does not support the jury's findings." *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 279 (4th Cir. 1999). But when ruling on a Rule 50(b) motion based on grounds not previously asserted in a Rule 50(a) motion, we engage in a much more demanding standard of review. As we have explained,

> The Fourth Circuit has held that a party who does not move for judgment as a matter of law on an issue pursuant to Rule 50(a) waives its right to move to set aside a verdict for that reason pursuant to Rule 50(b). *Smith v. Univ. of N.C.*, 632 F.2d 316, 338–39 (4th Cir. 1980). Further, a party who waives an argument before a district court may not appeal the same argument to this court. *Id.* Consequently, this court does not review the sufficiency of

10

evidence not challenged on a Rule 50(a) motion. *Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.*, 41 F.3d 182, 188 (4th Cir. 1994).

*Tidewater Fin. Co., Inc. v. Fiserv Sols., Inc.*, 4 Fed. App'x 201, 204 (4th Cir. 2001). In other words, a party can only challenge the sufficiency of the evidence on appeal for an issue raised in a 50(b) motion, which must have been raised in an earlier 50(a) motion. *See id.*; *see also Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 160 (4th Cir. 2012); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006). However, this Court will consider an issue raised for the first time on appeal "in very limited circumstances," *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985), in which case "we may reverse only if the newly raised argument establishes 'fundamental error' or a denial of fundamental justice," *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014); *see also Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020). "This rigorous standard is an even higher bar than the 'plain error' standard," as the "'fundamental error' must be 'so serious and flagrant that it goes to the very integrity' of the proceedings." *Id.* (quoting *Stewart*, 770 F.2d at 1271).

## III.

We must first determine whether the Armor Defendants' Rule 50(b) motion was based on grounds not previously asserted in their Rule 50(a) motion.[5] "[A] motion for

---

[5] In its opinion denying Defendants' Rule 50(b) motion, the District Court held that in Defendants' 50(a) motion, "they did not seek judgment as a matter of law for Plaintiff's simple negligence claim (Count 1), and so the Court cannot not take up any additional motions for judgment pertaining to Count 1 at this renewed-motion stage." J.A. 1551. This was clearly incorrect, as reflected in the record, including the Court's prior ruling made at trial. When denying Defendants' 50(a) motion, the District Court stated, "I've reviewed the elements for Count One, for Count Two, and Count Four. . . . I'm going to deny both defendants' motion for judgment as a matter of law because the plaintiff has produced (Continued)

11

judgment as a matter of law at the close of the plaintiff's case and a similar motion at the close of all of the evidence can be considered together in determining whether specific grounds were made sufficiently clear" for purposes of a renewed 50(b) motion.[6] 9B Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2533 (3d ed. updated 2024).

Rule 50(a) requires that the movant "specify the judgment sought and the law and facts that entitle the movant to the judgment," and the movant can only renew such motion under Rule 50(b) on the same grounds as initially specified. Fed. R. Civ. P. 50(a)–(b); *Price*, 93 F.3d at 1248–49. This "requirement of a proper [Rule 50(a)] motion as foundation for a motion [ ] under Fed. R. Civ. P. 50(b) is not a mere technicality; it serves vitally important interests in the fair conduct of litigation." *Miller v. Premier Corp.*, 608 F.2d 973, 979 n.3 (4th Cir. 1979). Those interests are to protect the Seventh Amendment right to trial by jury, to provide notice to the court and the non-moving party of any alleged deficiencies in the evidence, and to provide the non-moving party with an opportunity to cure the evidentiary deficiency before resting. *Fed. Sav. & Loan Ins. Corp. v. Reeves*, 816 F.2d 130, 137–38

---

evidence on each element as it relates to Counts One, Two, and Four . . . . [A] reasonable tier [sic] of fact could conclude . . . that the defendant was negligent . . . . " J.A. 1023; *see also* J.A. 1260.

Therefore, to the extent that the Armor Defendants' Rule 50(b) motion renewed its 50(a) motion as to Count One *generally*, we find that was proper. The remainder of this section addresses whether the proximate cause arguments (for both Counts One and Two, negligence and gross negligence) raised in their 50(b) motion had been raised in their 50(a) motion.

[6] The Armor Defendants' 50(a) motion raised at the close of the Plaintiff's evidence and their 50(a) motion raised at the close of Defendants' evidence will thus be referred to jointly as a "50(a) motion" in the singular.

(4th Cir. 1987). Rule 50, as all Federal Rules of Civil Procedure, is to be liberally construed. *Singer v. Dungan*, 45 F.3d 823, 829 (4th Cir. 1995).

We find that Defendants' 50(a) motion did not provide Plaintiff with notice as to the alleged deficiency of proximate cause evidence as it relates to LPN Peck and, accordingly, they could not raise the issue in their 50(b) motion.

## A. Defendants' Rule 50(a) Motion

After Plaintiff rested his case, the Armor Defendants moved for judgment as a matter of law against LPN Peck on the "two heightened claims"—gross negligence and deliberate indifference—arguing that "there isn't sufficient evidence as to her subjective state of mind." J.A. 1006. Defendants' counsel then continued,

> And then I have a broader motion with respect to causation. Dr. Kundi is the causation expert. Dr. Bethea said on the stand – I think actually on redirect – that these were decisions for the vascular surgeon and what was going to happen and what was going to be performed and if he was going to survive. That's all within the vascular surgeon.
>
> The vascular surgeon offered expert testimony on it, but he was clear on cross that he was assuming a number of things about the actions of other healthcare providers. He was making those assumptions based on his experience at his hospital. This hospital has – or he admitted that he doesn't know where Mr. Boley would have gone. He doesn't know what kind of capabilities they had. He doesn't know any of the providers there. So he's making an assumption about what testes [sic] would have been run, what assessments would have been made by those independent providers who aren't here, and we don't know who they would be even. And there has to be some sort of factual basis for his statement that Mr. Boley would have lived had, in this particular context – regardless of what happens in Maryland – in this particular context, had he gone to the ER. And you've got at least three or four that I counted things that he admitted were an assumption.
>
> So based on the speculative nature of that, we don't think the plaintiff has established causation as to anything, but we're making separate arguments as to liability on those four [sic] claims.

13

J.A. 1008–09. In his response, Plaintiff's counsel did not address causation, but rather focused on the sufficiency of evidence demonstrating the requisite state of mind for his deliberate indifference and gross negligence claims. J.A. 1012–16, 1020–21.

After the close of Defendants' evidence, counsel for the Armor Defendants made another 50(a) motion and "incorporate[d] prior arguments that were made." J.A. 1257. He added,

> I would renew my arguments with respect to causation as we now have had expert testimony further establishing that there were multiple things that would have had to occur.
>
> These experts disagree that they would have occurred, but they were all clear about all the steps that were not as clearly laid out by plaintiff's expert, especially considering that he is not familiar with the current – with the area medical facilities.

J.A. 1257–58.

While Defendants' 50(a) motion did mention the issue of causation generally, with counsel stating that "I have a broader motion with respect to causation," and later, "we don't think the plaintiff has established causation as to anything," J.A. 1008–09, he also homed in on a more specific causation issue: insufficient evidence regarding what would have happened had Boley been sent to the hospital. Furthermore, Defendants' counsel never mentioned LPN Peck when discussing causation.

## B. Defendants' Rule 50(b) Motion

After the jury returned their verdict, the Armor Defendants filed their Rule 50(b) motion. In this motion, Defendants put forth an argument that

> Plaintiff failed to meet his burden to present sufficient evidence proving that Nurse Peck's acts or omissions were the proximate cause of Boley's death. No medical doctor testified that Nurse Peck should have gotten Boley to a hospital on April 16, or that any alleged breach of her standard of care proximately caused decedent's death. Stated another way, Plaintiff offered no evidence that had Nurse Peck complied with the standard of care, Boley's outcome would have been any different.

J.A. 1462. They continued that "Plaintiff's evidence stopped at the standard of care for Nurse Peck," and that "[n]one of Plaintiff's medical experts offered a causation opinion" regarding LPN Peck. J.A. 1468.

The only place in their Rule 50(b) motion that Defendants referred to an alleged insufficiency of the evidence on what would have happened had Boley been sent to the hospital was in a footnote in their statement of facts[7]—but nowhere in their argument section. J.A. 1467.

We find that the argument raised in Defendants' 50(a) motion—that Plaintiff failed to present sufficient evidence establishing what treatment Boley would have received at the hospital to save him—is distinct and different from that which Defendants raised in their Rule 50(b) motion—that Plaintiff failed to present sufficient evidence establishing that LPN Peck's breach of the standard of care proximately caused Boley's death. The fact that Defendants challenged Plaintiff's evidence on "causation as to anything," J.A. 1009,

---

[7] This footnote reads: "Plaintiff was also required to offer an expert in emergency medicine, a distinct medical field, to opine on any workup, diagnosis and lifesaving treatment Boley would have received in the ER.… Plaintiff made multiple attempts to bridge the gap, but Defendants objected repeatedly to either doctor testifying about what would have happened when Boley reached the ER, which objections the Court ultimately sustained." J.A. 1467.

15

does not broaden the scope of their 50(a) motion where they specifically articulated a narrower issue. While this Court has "recognized the caution with which we must proceed in determining whether a sufficiency of the evidence challenge made orally has been properly preserved," and we are appreciative of the immense stress attorneys face when trying to make oral trial motions under fire, we also do not require a district court to "read counsel's mind" to determine the grounds on which a Rule 50(a) motion is made, and the "onus is on counsel to adequately convey his or her arguments and requests to the court." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 157–58 (4th Cir. 2012). Allowing attacks as vague as a "broader motion with respect to causation," J.A. 1008, to satisfy the Rule 50 standard would prevent the rule from serving its fundamental purpose—to put opposing counsel on notice as to evidentiary deficiencies.[8] *See Belk, Inc.*, 679 F.3d at 157 ("oral exchanges must comply with the demands of the rule").

---

[8] Review of various filings in the lower court does not rescue Defendants' 50(b) motion by putting Plaintiff on notice. Defendants' Motion for Summary Judgment did not address the issue of proximate cause. Rather, the motion as it concerned LPN Peck focused on a lack of evidence that Boley ever spoke to her or reported his chest pain for the purpose of establishing whether she deviated from the applicable standard of care. *See* Brief in Support of the Armor Defs.' Mot. for Summ. Judg., *Boley v. Armor Correctional Health Servs., Inc. et al*, No. 21-cv-00197 (E.D. Va. Apr. 19, 2022), ECF No. 58 at 3–4, 21–23. Defendants also filed a Pretrial Memorandum Regarding Causation Testimony just days before trial began, raising a concern only about potential "opinions from Plaintiff's experts of what other unnamed and hypothetical physicians would have done had they seen the Decedent on April 16th." J.A. 130.

Therefore, there are no pretrial motions that would have put Plaintiff on notice as to the issue that Defendants then raised in their Rule 50(b) motion. *Cf. Fed. Sav. & Loan Ins. Corp.*, 816 F.2d at 138 (noting that, despite defendants' failure to raise a 50(a) motion, "plaintiff had adequate notice of this challenge from defendants' answers to the complaint and amended complaint").

16

We conclude that the Armor Defendants did not raise the issue of proximate causation as for LPN Peck in their Rule 50(a) motion, and therefore the issue could not be renewed in their Rule 50(b) motion.

**IV.**

We next consider whether there was sufficient evidence for the jury to find that LPN Peck proximately caused Boley's death under Virginia law. Because the Armor Defendants' Rule 50(b) argument was not previously raised in their Rule 50(a) motion, we review for plain error that, if otherwise not corrected, would result in a fundamental error or a denial of fundamental justice. *See Stewart*, 770 F.2d at 1271.

The critical question is whether, under Virginia law in a medical negligence case, there was appropriate evidence to conclude that the actions of LPN Peck proximately caused the death of Robert Boley. The issue of proximate causation, like that of negligence more broadly, is ordinarily a question of fact for a jury to decide. *Brown v. Koulizakis*, 229 Va. 524, 531 (1985). In order to demonstrate proximate cause under Virginia law, a plaintiff must show that the defendant's "act or omission [ ], in natural and continuous sequence unbroken by a superseding cause, produces a particular event and without which that event would not have occurred." *Williams v. Joynes*, 278 Va. 57, 62 (2009). "[E]xpert testimony is ordinarily necessary to . . . establish that [ ] a deviation [from the standard of care] was the proximate cause of the claimed damages." *Raines v. Lutz*, 231 Va. 110, 113 (1986); *see also Fitzgerald v. Manning*, 679 F.2d 341, 347–50 (4th Cir. 1982). Two requirements must be met for a medical expert's causation testimony to reach a jury: (1) the likelihood that the defendant's conduct caused the plaintiff's injury, and (2) whether the expert expressed

17

this opinion to a reasonable degree of medical certainty. *Riggins v. SSC Yanceyville Operating Co., LLC*, 800 Fed. App'x 151, 156–57 (4th Cir. 2020). As for the first requirement, in cases resulting in death such as this one, "if a plaintiff's evidence has shown that the defendant's negligence has destroyed any substantial possibility of the patient's survival, then there is sufficient evidence of proximate cause to go to the jury." *Blondel v. Hays*, 241 Va. 467, 474 (1991); *see also Brown*, 229 Va. at 532. This Circuit has explained that, under Virginia law, "applying the 'substantial possibility of survival' concept to the causation element of medical malpractice cases does nothing more than require a plaintiff to prove that it is more likely than not that the decedent would have survived in the absence of the defendant's negligence." *Murray v. United States*, 215 F.3d 460, 465 (4th Cir. 2000).

Here, we review the record for evidence put forth by Plaintiff that would allow the jury to proximately link LPN Peck's conduct to Boley's death, which, chiefly, requires review of Plaintiff's experts' testimony. While no individual expert explicitly stated that LPN Peck proximately caused Boley's death, such could be reasonably inferred from the experts' testimony taken together. Dr. Roscoe testified that LPN Peck should have conducted a physical examination of Boley, and Dr. Bethea testified that a physical examination would have definitively revealed something that would raise concern for an aneurysm, including potentially a pulsatile mass. Dr. Roscoe also testified that as an LPN, Peck would collect this and other data from a patient evaluation and bring such information to a provider—in this case, Dr. Harris. Dr. Bethea testified that even a medical student would recognize the severity of the situation and their obligation to immediately transfer Boley to a hospital. It follows that an LPN who had spent thirty years in correctional

18

medicine and been stationed at Deerfield since 2015, *see* J.A. 1124, would be similarly aware of the severity of Boley's symptoms and that action needed to be taken. Drs. Bethea and Kundi both explained the care Boley would have received once transferred to the hospital, and both testified that if he had been sent to the hospital at any time before midnight, it was more likely than not that he would have survived. While no expert may have directly stated that LPN Peck proximately caused Boley's death, "[w]hen predicate facts are proven and the jury can draw a reasonable inference without resorting to speculation or conjecture, the decision whether to draw the inference is the jury's." *McGuire v. Hodges*, 273 Va. 199, 208 (2007); *see also Charleston Area Med. Ctr., Inc. v. Blue Cross and Blue Shield*, 6 F.3d 243, 248 (4th Cir. 1993) ("the inferences a jury draws to establish causation must be reasonably probable").

The Armor Defendants argue that even if LPN Peck had adhered to her standard of care and relayed pertinent information to Dr. Harris, he "would not have referred Boley to the emergency room that day anyway."[9] Opening Br. at 28; *see also* J.A. 1478 (making

---

[9] In their 50(b) motion, Defendants contended that the insufficiency of the evidence on Peck's proximate cause was due, in part, to the fact that Plaintiff's own evidence suggested that Dr. Harris's actions "severed any implied or circumstantial causation theory against Nurse Peck." J.A. 1479. They clarified that they were "not offering a post-trial defense that Dr. Harris' actions were a superseding cause of Robert Boley's death under Virginia law," but rather than their "discussion about Dr. Harris [was] to demonstrate the evidentiary shortcomings in Plaintiff's case against Nurse Peck." J.A. 1511. Even cast in that light, their argument is unavailing.

It also bears mentioning that LPN Peck and Dr. Harris were represented by the same attorney at trial, which likely explains Defendants' failure to raise the affirmative defense of superseding cause at that time. It is only now that Harris has been found not liable that the Armor Defendants pursue this line of reasoning.

same argument in Rule 50(b) motion). But, even if true, that contention does not absolve LPN Peck of her causal liability. Plaintiff had no obligation to show that Dr. Harris would in fact have sent Boley to the hospital had LPN Peck contacted him instead of LPN Hayes; rather, Plaintiff had to present expert testimony that a *reasonable* doctor confronted with such information would have sent Boley to the hospital. The fact that Dr. Harris allegedly acted *unreasonably* does not here break the causal chain.

"In order to relieve [Peck] of liability for [her] negligent act, the negligence intervening between [Peck's] negligent act and the injury"—here, Dr. Harris's purported breach of his standard of care—"must so entirely supersede the operation of [her] negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury." *Atkinson v. Scheer*, 256 Va. 448, 454 (1998). It cannot be said that Peck's alleged negligence did not contribute "in the slightest degree" to Boley's eventual death.[10] *Id.* This is underscored by the fact that an event can have more than one

---

[10] *Compare to Williams*, 276 Va. at 167 (finding that, where "the communication problems in this case were begun and put into motion by [defendant's] failure to make direct contact with [other doctors]," it "cannot be said that [the defendant's] alleged negligence was not contributing 'in the slightest degree' to the death of [the plaintiff]"); *Jenkins v. Payne*, 251 Va. 122, 129 (1996) (in a case where a plaintiff sought treatment from both a nurse practitioner and a gynecologist, holding that "the [nurse practitioner] and [gynecologist] were subject to the same standard of care and they all failed to diagnose the cancer before [plaintiff's] condition became terminal. Therefore, reasonable persons could not conclude from the evidence that [gynecologist's] negligence alone, without any contributing negligence by nurse practitioner in the slightest degree, caused plaintiff's death."); *Brown*, 229 Va. at 533 (finding that two doctors proximately caused a plaintiff's death, where the plaintiff went to one doctor, who breached his standard of care by failing to initiate diagnostic procedures that would have disclosed a fatal condition, and then went to another doctor the next day, who breached his standard of care by failing to order prompt testing).

proximate cause. *Jenkins v. Payne*, 251 Va. 122, 128 (1996). In this case, both LPN Peck and Dr. Harris—and others still—could have been found to proximately cause Boley's death. The jury was given an instruction to this effect: "If two or more persons are negligent, and if the negligence of each is a proximate cause of the plaintiff's injury, then each is liable to the plaintiff for his injury. This is true even if the negligence of one is greater than the negligence of the other." J.A. 1427.

Additionally, with respect to the inconsistent verdict, there is nothing logically forbidding the jury's finding of liability for LPN Peck and not for Dr. Harris. Instead, as the District Court correctly explained, "the jury could have reasonably assessed that Dr. Harris's behavior met the applicable standard of care while Nurse Peck's did not."[11] J.A. 1555. While appellate courts are not "rubber stamp[s]" for the conclusions of the jury, *Price*, 93 F.3d at 1250), these complex determinations are exactly why we place immense value on jury verdicts and are loathe to disturb them unless the evidence cannot support the verdict.

It cannot be said that allowing the question of whether LPN Peck's breach proximately caused Boley's death to reach a jury resulted in "fundamental error or a denial of fundamental justice." *In re Under Seal*, 749 F.3d at 285 (quotations omitted). Rather, the testimony at trial, considered in the light most favorable to the Plaintiff and drawing all inferences in Plaintiff's favor, establishes that there was sufficient evidence for a jury to

---

[11] This is underscored by the fact Defendants are not even contesting the sufficiency of the evidence regarding Peck's breach of the standard of care.

21

determine that LPN Peck's breach proximately caused Boley's death—i.e., that it was more likely than not that Boley would have survived if LPN Peck had adhered to her standard of care, or, in other words, that LPN Peck's breach destroyed Boley's substantial possibility of survival. *See Murray*, 215 F.3d at 465; *Blondel*, 241 Va. at 474. The District Court's decision to deny the Armor Defendants' Rule 50(b) motion will thus not be disturbed.

*    *    *

Altogether, we find that the District Court did not err in denying the Armor Defendants' motion for judgment as a matter of law.

**V.**

Alternatively, the Armor Defendants argue that the District Court erred in denying their motion for a new trial.

Under Federal Rule of Civil Procedure 59(a)(1), "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). A new trial should be granted if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. We

22

review a denial of a motion for a new trial for abuse of discretion. *See Bristol Steel & Iron Works*, 41 F.3d at 186.

Here, the Armor Defendants proffered three grounds warranting a new trial: (1) the District Court's imposition of disproportionate time constraints; (2) improper character testimony; and (3) remarks by Plaintiff's counsel during opening and closing statements.

*A. Time Limitations*

Firstly, the Armor Defendants contend that the District Court impermissibly imposed time limitations on the defense. While appellate courts "disfavor time limits that are set, managed, or revoked in an arbitrary or inflexible way," *Raynor v. G4S Secure Sols. (USA), Inc.*, 805 F. App'x 170, 177 (4th Cir. 2020), a district court "should exercise reasonable control over the mode . . . of examining witnesses and presenting evidence so as to . . . avoid wasting time," Fed. R. Evid. 611(a). Trial judges are in the best position to run their courtrooms, and are "entirely within their right to keep trial proceedings moving, and, if necessary, to ask counsel to pick up the pace," *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006), as well as to "impose reasonable restrictions," *United States v. Woods*, 710 F.3d 195, 200 (4th Cir. 2013) (quotations omitted).

On the third day of trial, the District Court articulated the need to conclude on the fifth day, as had been scheduled since almost six months prior to the trial's commencement. *See* J.A. 700, 1542; Minute Entry, *Boley v. Armor Correctional Health Servs., Inc. et al*, No. 21-cv-00197 (E.D. Va. June 13, 2022), ECF No. 89. The Court inquired as to the length of certain upcoming evidence and witness lists, and, based on that information, imposed time limits for each witness's examination. J.A. 697–700. The Court indicated that "[i]f we

23

need to extend it, you can ask me, but I'm going to be really tight on these timelines because I've got a criminal trial starting next week that has speedy trial issues, and I can't move it." J.A. 700. The Court asked Defense counsels if they had any questions about this plan, both of whom answered in the negative. *Id.*

The District Court held that the time limitations were not levied arbitrarily nor inflexibly so as to necessitate a new trial. As the Court acknowledged in its opinion, "[i]t is true that Plaintiff had more time to question his witnesses, but Plaintiff bore the burden of proof and persuasion on each of his counts." J.A. 1543. And, while the time limits were imposed in the middle of trial, neither party objected to them at the time they were imposed. Lastly, since the extent of LPN Peck's testimony was that she never interacted with Boley on the day preceding his death, allowing her more time to testify would not have meaningfully contributed to her defense.

Accordingly, the Court did not abuse its discretion in finding that its imposition of time limitations was not arbitrary nor inflexible and, therefore, in denying Defendants' motion for new trial on this basis.

### B. Improper Character Evidence

Second, the Armor Defendants argue that the jury was unduly influenced by improper character evidence offered against LPN Peck from two former inmates, Carlo Wilson and Marese Francis. Their statements were textbook impermissible character evidence.

Regarding Wilson's testimony, the Armor Defendants objected to numerous questions and answers during his direct examination about LPN Peck. The District Court

24

rightly sustained the objections. J.A. 578. However, some discussion about Wilson's testimony took place in the presence of the jury. In its opinion denying Defendants' motion for new trial, the District Court explained that it had "sustained the bulk of [the defendants'] objections" and thus held that "[u]ltimately, Wilson's admitted testimony was innocuous." J.A. 1553. But the Armor Defendants also argue that Plaintiff's "counsel—primarily through his own statements, not the witness's—had now cultivated those seeds within the jury's mind that Nurse Peck did not care about the inmates at Deerfield." Opening Br. at 36–37.

The District Court's conclusion is correct. However, it should have also mentioned the remarks made by Plaintiff's counsel in the presence of the jury, just as it considered Mr. Wilson's statements; although the bulk of each were stricken from the record, both could have influenced the jury. Nevertheless, in the final instructions, the jury was provided an instruction that "[s]tatements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence." J.A. 1402. Given that juries are presumed to follow instructions, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987), and because Defendants offer nothing to question this presumption, the Court's holding will not be disrupted for failing to address this concern.[12]

---

[12] Additionally, to bolster the district court's conclusion, it bears mentioning that counsel for the Armor Defendants could have asked for a bench conference earlier to address their objections outside the presence of the jury. He did not. It was not until after the Court called for a bench conference, that conference concluded, testimony resumed, and Plaintiff's counsel made additional comments that Defendants' counsel made another
(Continued)

As for Francis, Plaintiff attempted to elicit both opinion and reputation testimony concerning LPN Peck. The District Court sustained numerous objections, struck certain testimony, and ultimately read a curative instruction to the jury, to which no Defendant objected. J.A. 901–02. In its opinion, the Court found that "the nature of the comments heard by the jury were not so prejudicial as to make the Court's curative instruction insufficient." J.A. 1554.

As mentioned above, there is a presumption that a jury will follow a curative instruction "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer*, 483 U.S. at 766 n.8 (quotations omitted). The District Court did not abuse its discretion in concluding that the Armor "Defendants offer little reason . . . to believe that the jury ignored the curative instruction or was otherwise confused in a way that prejudiced Nurse Peck." J.A. 1555. Defendants' argument that "the conflicting verdicts between Nurse Peck and Dr. Harris" indicate "the jury was likely swayed by improper character evidence at trial offered over defense objections," Opening Br. at 31, is nothing more than a post-hoc rationalization for what they deem an inconsistent verdict, rather than a predicate explanation for why the jury was unable to follow instructions.

---

objection and "ask[ed] that the proffer be taken outside the presence of the jury." J.A. 579. An earlier request could have removed the potentially poisonous "seeds" from the purview of the jury.

A district court's decision to grant or deny a new trial is "not reviewable upon appeal, save in the most exceptional circumstances," *Linder v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 168 (4th Cir. 1985), because "the district judge is in a position to see and hear the witnesses and is able to view the case from a perspective that an appellate court can never match," *Bristol Steel & Iron Works*, 41 F.3d at 186 (quotation omitted). Here, the District Court's decision in denying Defendants' motion was not an abuse of discretion.

## C. *Plaintiff's Opening and Closing Remarks*

Finally, the Armor Defendants argue that Plaintiff's counsel's inappropriate comments during opening and closing argument warranted a new trial.

Defendants contend that "[d]uring opening, Plaintiff's counsel promised the jury would hear evidence that Nurse Peck 'waved' and 'brushed off' her patients." J.A. 1480. However, the transcript contains no such remarks.

During his closing argument, Plaintiff's attorney stated that the Defendants "disparage the concept of CT testing," but that "[m]y dog has received CT testing when I brought [him] into the veterinarian." J.A. 1371. He later stated that in his "small cul-de-sac[,] I've gone to help our neighbors dozens of times," but that Dr. Harris had "never gone over [to Deerfield Men's Work Center] at the behest of any nurse." J.A. 1317–18. He then called the level of care provided at the work center "atrocious" and failing to "even meet a third world country," comparing it to medical care addressing the AIDS crisis in South Africa that he had seen while on church trips. J.A. 1319–20. Finally, Plaintiff's counsel told the jury that LPN Peck's testimony that Boley never sought care from her was "false"

27

and, rather, that "[s]he blew him off and lied to you that she did otherwise." J.A. 1311. No defendant objected to any of these statements.

"It is the universal rule that during closing argument counsel cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." *Dennis v. Gen. Elec. Corp.*, 762 F.2d 365, 366–67 (4th Cir. 1985). "A motion for a new trial should not be granted, therefore, where the moving party has failed to timely object to the alleged impropriety giving rise to the motion." *Id.* at 367 (citation omitted). "The failure to object at the proper time will be overlooked on appeal only if exceptional circumstances exist such as when the error is so obvious or so serious that the public reputation and integrity of the judicial proceeding is impaired." *Id.*

According to the District Court, Plaintiff's counsel "did inject the conclusion of his argument with multiple personal anecdotes and opinions" that were "enough . . . to give the Court pause," but it ultimately concluded that these statements were "not so egregious as to absolve Defendant [ ] of his obligation to object to them before the verdict." J.A. 1545. We defer to the District Court's finding as to the impropriety and effect of these statements because, as noted above, it was "in a position to see and hear" the attorney's demeanor and the jurors' reactions "from a perspective that an appellate court can never match" by reading a cold transcript of the proceedings. *Bristol Steel & Iron Works*, 41 F.3d at 186. Additionally, the Court explained that "[e]ven if" the statements were so outrageous as to eliminate the need to object, the first and last instructions read to the jury—directing

28

them to reach a verdict based on reason, rather than passion—countered the potential effect of any impropriety. J.A. 1546.

The District Court did not abuse its discretion in denying Defendants' motion for new trial on the basis of Plaintiff's counsel's remarks during closing argument.

*        *        *

Accordingly, the District Court did not err in denying the Armor Defendants' motion for new trial.

## VI.

For the reasons stated above, we determine that the District Court did not err in denying the Armor Defendants' Rule 50(b) motion for judgment as a matter of law, and did not abuse its discretion in denying Defendants' request for a new trial. Accordingly, the judgment is

*AFFIRMED.*

29

QUATTLEBAUM, Circuit Judge, concurring in part and in the judgment:

I agree with the majority's decision to affirm the district court's denial of Arleathia Peck's motion for a new trial. I also agree that Peck's Rule 50(b) motion asserts grounds different from those previously asserted in her Rule 50(a) motion. But after that, I part ways with my colleagues. First, in purporting to review the district court's denial of Peck's Rule 50(b) motion for fundamental error or denial of fundamental justice, the majority holds that a reasonable jury could interpret the expert testimony in the record to conclude Peck's misconduct caused Robert Boley's death. But for medical malpractice actions like this one, Virginia law demands expert testimony on causation. And because of an understandable trial strategy, the plaintiff offered no expert testimony that Peck's substandard care caused Robert Boley's death. Second, but more importantly, the majority misjudges the effect of Peck moving under Rule 50(b) on a ground not asserted in her Rule 50(a) motion. We do not review forfeited Rule 50(b) motions for fundamental error or denial of fundamental justice; instead, the variance between Peck's Rule 50(a) and 50(b) motions forfeited any review of the district court's decision. So, even though I do not think the record contains any evidence Peck caused Boley's death, I would still affirm.

**A.**

On the morning of April 16, 2019, Boley, an inmate in the Virginia Department of Corrections' Deerfield Men's Work Center, began having chest pain. Around 1:30 p.m., he went to see Peck, the facility nurse. Peck refused to examine Boley, telling him that he needed to submit a medical slip to be seen the next day. Boley laid down in the middle of

30

the hallway in an effort to force facility staff to give him medical attention. About an hour after she turned Boley away, Peck's shift ended, and she left Deerfield.

Around 3:00 p.m., Nurse Charlotte Hayes came from another building to check on Boley. Hayes took his vitals, finding a blood pressure of 66/48 and a pulse of 60 beats per minute. She then contacted the only on-duty physician that day, Dr. Alvin Harris. Hayes told Dr. Harris that Boley may have "missed some blood pressure pills and had taken more than one." J.A. 703. She added that "there was something going on with his blood pressure medicine." J.A. 703. Dr. Harris instructed her to recheck Boley's vitals and perform an EKG before calling him back with the results. Hayes did, reading him the EKG results over the phone. Dr. Harris asked Hayes whether there was "an acute infarction pattern, which you would see with Q waves and myocardial ischemia with T wave inversions." J.A. 683. But the EKG report did not have that information. Hayes told Dr. Harris that Boley's vitals were stable and that he was feeling better. So, Dr. Harris prescribed an antacid and asked Hayes to call back in a few hours.

About three hours later, Hayes called Dr. Harris for the third time. Boley still felt bad but was "significantly improved." J.A. 668. Dr. Harris decided not to send Boley to the ER. Instead, he scheduled to see Boley the next morning.

Just before 7:00 p.m., Hayes gave Boley another antacid and returned him to his unit. Around 5:30 a.m. the next morning, security staff noticed Boley sitting up in his cell, unresponsive. He was pronounced dead shortly afterward of a ruptured aortic aneurysm.

Boley's brother sued Peck, Hayes and Dr. Harris, alleging negligence, gross negligence and willful and wanton negligence.[1] Prior to trial, Boley settled with Hayes. So, the case went to trial as to Peck and Dr. Harris. Peck unsuccessfully moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The jury then found Dr. Harris not liable. But it found Peck liable and awarded $4,000,000 in damages. In response, Peck moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), arguing that Boley failed to introduce the necessary expert testimony that Peck's negligence proximately caused Boley's death. The district court denied the motion. First, it determined that Peck had forfeited that argument by not making in it her Rule 50(a) motion. Then, the court found the record contained evidence from which a reasonable jury could have determined that Peck caused Boley's death. Peck appealed that ruling.

**B.**

As the majority notes, Peck failed to argue that Boley did not introduce expert testimony that her negligence caused Boley's death in her Rule 50(a) motion. This means that Peck's Rule 50(b) motion did not renew her Rule 50(a) motion. The majority properly concludes that Peck therefore forfeited her challenge to the sufficiency of the evidence. So far, so good.

But the majority then explains,

[T]his Court will consider an issue raised for the first time on appeal "in very limited circumstances," *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985), in which case "we may reverse only if the newly raised argument establishes

---

[1] Boley also brought other claims against these defendants and sued additional defendants not mentioned here. But those claims and defendants are not before us.

'fundamental error' or a denial of fundamental justice," *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014); *see also Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020). "This rigorous standard is an even higher bar than the 'plain error' standard," as the "'fundamental error' must be 'so serious and flagrant that it goes to the very integrity' of the proceedings." *Id.* (quoting *Stewart*, 770 F.2d at 1271).

Maj. Op. at 11. As I describe in part C below, I think that is the wrong standard. A party's failure to move pursuant to Rule 50(b) deprives an appellate court of the power to touch the jury verdict.

But preliminarily, I disagree with the majority's application of the standard it articulates. For starters, while the majority correctly claims that Peck forfeited any ability to challenge the verdict for insufficiency of evidence, it nevertheless appears to apply a sufficiency standard. *See* Maj. Op at 17 ("We next consider whether there was sufficient evidence for the jury to find that LPN Peck proximately caused Boley's death under Virginia law.") and 18 ("Here, we review the record for evidence put forth by Plaintiff that would allow the jury to proximately link LPN Peck's conduct to Boley's death, which, chiefly, requires review of Plaintiff's experts' testimony. While no individual expert explicitly stated that LPN Peck proximately caused Boley's death, such could be reasonably inferred from the experts' testimony taken together."). True, the majority ultimately returns to its stated standard, reciting that allowing the jury to consider whether Peck's conduct caused Boley's death was not a fundamental error or a denial of fundamental justice. But after saying that, the majority explains that "the testimony at trial, considered in the light most favorable to the Plaintiff and drawing all inferences in Plaintiff's favor, establishes that there was sufficient evidence for a jury to determine that

33

LPN Peck's breach proximately caused Boley's death . . . ." Maj. Op. at 21–22. So, the majority seems to commingle the sufficiency of evidence standard with the fundamental error or denial of fundamental justice standard.

Aside from that, I disagree that there is evidence in the record that Peck caused Boley's death. To repeat, Virginia law requires expert witness testimony to prove causation. "The general rule in medical malpractice cases is that an expert is required to establish that the defendant 'deviated from the applicable standard of care and the deviation was a proximate cause of the injuries claimed.'" *Summers v. Syptak*, 801 S.E.2d 422, 425 (Va. 2017) (quoting Va. Code Ann. § 8.01–20.1).[2] "Malpractice is defined in the [Virginia Medical Malpractice] Act as any tort based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." *Pierce v. Caday*, 422 S.E.2d 371, 373 (Va. 1992) (internal quotation marks omitted).

For sure, Boley introduced expert testimony that Peck violated the applicable standard of care for nurses. His nursing expert, Dr. Lori Roscoe, testified that a "person presenting with chest pain would necessarily have to be asked a series of questions about that chest pain, their medical history. And then vital signs should be obtained, and we also should have a physical examination of that patient." J.A. 742. But Dr. Roscoe did not say that Peck's conduct caused Boley's death.

---

[2] There is an exception that "expert testimony is unnecessary [when] the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." *Summers*, 801 S.E.2d at 425. But Boley does not make this argument.

Nor did Boley's other expert witnesses. In addition to Dr. Roscoe, Boley called Drs. William Bethea and Rishi Kundi. Neither said Peck's conduct caused Boley's death.

Rather than testifying about Peck—or for that matter Hayes—Dr. Bethea took aim at Dr. Harris. He testified that once Dr. Harris had the information Hayes provided about Boley's chest pain and vitals, he should have transferred Boley from the prison to a hospital ER. Boley's other expert, Dr. Kundi, testified about causation as to Dr. Harris. He said that proper testing at a hospital would have revealed Boley's aneurysm. Dr. Kundi explained that had Boley gotten to the hospital by midnight on the night of April 16, 2019, it is "more likely than not that he would have survived." J.A. 851. Dr. Bethea echoed Dr. Kundi's opinion that Boley would likely have survived if he had been sent to an ER. But neither Dr. Kundi nor Dr. Bethea even mentioned Peck. They certainly did not testify that Peck's conduct caused Boley's death.

To the majority, this doesn't matter. It insists that "[w]hile no individual expert explicitly stated that LPN Peck proximately caused Boley's death, such could be reasonably inferred from the experts' testimony taken together." Maj. Op. at 18. That might work in a run-of-the-mill negligence claim. But it doesn't for medical malpractice cases. For such cases, Virginia law is clear. Expert testimony is required to establish that the defendant "'deviated from the applicable standard of care and the deviation was a proximate cause of the injuries claimed.'" *Summers*, 801 S.E.2d at 425 (quoting Va. Code Ann. § 8.01–20.1). Of Boley's multiple expert witnesses, none testified that Peck's conduct caused Boley's death. Not one. We can't ignore that total absence of evidence for an essential element of Boley's claim. And we can't cobble together insufficient testimony

35

and say that, collectively, it's enough. As Billy Preston sang, "Nothin' from nothin' leaves nothin', you gotta have something.'"[3] In Virginia, that "somethin'" is expert causation testimony, and Boley doesn't have it.

Compounding its first error, the majority ignores Hayes and Dr. Harris in its causation analysis. According to the majority, we can look away from the actual evidence in this case and pretend Dr. Harris was not the doctor on call at the time of Boley's ailment. While it cites no authority, the majority insists that Boley "had no obligation to show that Dr. Harris would in fact have sent Boley to the hospital had LPN Peck contacted him instead of LPN Hayes; rather, [Boley] had to present expert testimony that a *reasonable* doctor confronted with such information would have sent Boley to the hospital." Maj. Op at 20.[4] But that is not how causation works. To be sure, we would compare a hypothetical reasonably prudent nurse against Peck's conduct to see if it violates the applicable standard of care. And likewise, we would use a hypothetical reasonably prudent physician to measure Dr. Harris' conduct. But I know of no authority that suggests we look to an imaginary world with a different cast of characters from those actually there, or a different set of facts from those that actually occurred, to assess causation. Dr. Harris was the only

---

[3] Billy Preston, *Nothing from Nothing*, on *The Kids & Me* (A&M Records 1974).

[4] According to the majority, the argument that Dr. Harris would not have sent Boley to the hospital anyway involves superseding causation. There are at least two problems with this. First, as the name suggests, a superseding cause must displace an earlier cause. Boley adduced no expert testimony that Peck caused Boley's death, so there is no cause for Dr. Harris to supersede. Second, Peck never made a superseding cause argument. I do not understand how the majority can use a theory of defense that Peck did not make against Peck to relieve Boley of his burden to produce expert testimony on causation.

doctor on call at the prison. And he did not transfer Boley despite the information provided by Hayes. Peck's alleged causation of Boley's death runs through Dr. Harris, whether he acted appropriately or not. And there is nothing in the record indicating he would have transferred Boley to the ER had Peck followed the standard of care for nurses.

Seeking to avoid this problem, the majority finds that Peck was a more experienced nurse than Hayes and would have provided better information from the EKG. But there is no evidence to support this theory. None. In fact, Dr. Bethea refuted it. First, he testified that Dr. Harris should have transferred Boley regardless of the EKG results. According to Dr. Bethea, regardless of the EKG, Boley's blood pressure and reports of pain should have caused Dr. Harris to transfer Boley to the ER. Second, Dr. Bethea rejected any suggestion that inadequate information from Hayes played a role in Dr. Harris' failure to transfer Boley to the ER. In fact, Dr. Bethea could not have been clearer. From Dr. Bethea's perspective, Dr. Harris should have transferred Boley regardless of Hayes' responses to his questions.

So, the record forecloses the argument Boley now makes. Indeed, the only on-point evidence at trial came from one of Peck's experts, Dr. Deepak Talreja. He was asked, "do you believe that any action or inaction of the medical staff at Deerfield, and specifically Dr. Harris and Nurse Peck, caused Mr. Boley's death?" J.A. 1061. He answered, "I do not believe so, no." J.A. 1061. Boley offered no evidence to rebut Dr. Talreja's testimony.

None of this is to criticize Boley's trial strategy. In fact, it made perfect sense to focus on Dr. Harris after settling with Hayes. Perhaps Boley could have introduced evidence that Hayes did not provide Dr. Harris with adequate information, while Peck

37

would have. But doing so would have sabotaged his claim against Dr. Harris. For good reason, Boley did all he could to avoid that, even if it meant leaving out evidence of an essential element of his claim against Peck. The likelihood of a verdict in favor of Dr. Harris but against Peck was probably low. But juries are unpredictable. And here this jury did the unexpected. The problem for Boley is that his reasonable strategy left him with no evidence to protect his verdict against Peck. Thus, under the standard of review employed by the majority, the district court should have granted Peck's Rule 50(b) motion.

## C.

But I think the majority is wrong on a more fundamental issue. We should not review Peck's appeal at all. That's because Peck's assertion of a different ground for relief in her Rule 50(b) motion from the ground she asserted in her Rule 50(a) motion deprived us of the power to review the district court's denial of Peck's motion.

I agree with how the majority begins its standard of review discussion. It properly notes that if a party moves under Rule 50(b) on grounds different from those asserted in a Rule 50(a) motion, we do not review for sufficiency of evidence. But after that, the majority veers off course. It cites *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985) and *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014) for the proposition that we may reverse an issue raised for the first time on appeal only if the newly raised argument establishes fundamental error. Next, citing *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020), the majority notes that fundamental error is "an even higher bar than the 'plain error' standard" applied in criminal cases. Maj. Op. at 11. But none of those cases involve Rule 50 motions. *Hicks* involved an appeal of an order granting summary judgment. *Stewart* was an appeal

38

of a jury verdict with no mention of Rule 50, directed verdicts, judgment notwithstanding the verdict or judgments as a matter of law. Likewise, *Under Seal* involved an appeal of a civil contempt order.

In contrast, in the context we face here—forfeited Rule 50 motions—the Supreme Court has said we cannot review the district court's denial at all. In *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006), the Supreme Court held that "a party's failure to file a Rule 50(b) motion deprives the appellate court of the power to order the entry of judgment in favor of that party where the district court directed the jury's verdict." (citing *Globe Liquor Co. v. San Roman,* 332 U.S. 571 (1948)). The Court concluded, "we hold that since respondent failed to renew its preverdict motion as specified in Rule 50(b), there was no basis for review of respondent's sufficiency of the evidence challenge in the Court of Appeals." *Id.* at 407. We've said the same thing. *See A Helping Hand, LLC v. Baltimore Cnty., Md.*, 515 F.3d 356, 369–70 (4th Cir. 2008) (holding that where a party made a Rule 50(a) motion that was denied but never renewed under Rule 50(b), "[l]ike the appellant in *Unitherm,* the County 'failed to renew its pre-verdict motion as specified in Rule 50(b),' and so, like the appellate court in *Unitherm,* we have 'no basis for review.'"). *Unitherm* and *Helping Hand* indicate that a party's failure to comply with Rule 50(b) renders both district courts and appellate courts powerless to grant the relief sought.

True, unlike Peck, the appellants in *Unitherm* and *Helping Hand* failed to file any Rule 50(b) motion at all. And the complete absence of a Rule 50(b) motion was important in *Unitherm*. The Court reasoned that "a postverdict motion is necessary because determination of whether a new trial should be granted or a judgment entered under Rule

39

50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." *Unitherm,* 546 U.S. at 401 (cleaned up). But the Court went on to note that the appellant there sought relief on a ground different from the ground asserted in its Rule 50(a) motion. *Id*. at 404. And it explained that since a district court could not grant relief under Rule 50(b) for a ground not asserted in a Rule 50(a) motion—because the Rule 50(b) motion was not a renewal of the relief sought in the Rule 50(a) motion—an appellate court likewise could not grant relief on that ground. *Id*. at 404–05; *see also* Fed. R. Civ. P. 50 (b) ("[T]he movant may file a renewed motion for judgment as a matter of law."). And consistent with that, we—admittedly in an unpublished decision—have held that moving under Rule 50(b) on a different ground than that asserted in a Rule 50(a) motion does not "renew" the Rule 50(a) motion and thus does "not comply with Rule 50(b)." *Williams v. Brooksby*, No. 22-1982, 2024 WL 4490636, at *3 (4th Cir. Oct. 15, 2024).[5]

---

[5] In fairness, the parties did not help us zero in on the right standard of review. Boley argued that we review forfeited Rule 50(b) arguments for "any evidence," relying on our *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182 (4th Cir. 1994) decision, and Peck asserted the same standard of review, relying on *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1249 (4th Cir. 1996), which in turn relied on *Bristol*. And *Bristol* generally supports that approach. *Bristol*, 41 F.3d at 187 (when a party never moved under Rule 50(b), our scope of review was "limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a 'manifest miscarriage of justice'" (quoting *Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 297 (5th Cir. 1978))); *see also Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 501–02 (4th Cir. 2001). But although *Unitherm* post-dates all those decisions, neither mentioned it.

Here, as the majority notes, Peck's Rule 50(b) motion did not renew her Rule 50(a) motion. As a result, we are without power to review the denial at all. For this reason, separate from the majority's, the district court's denial of Peck's Rule 50(b) motion should be affirmed.